| | |
|---|---|
| **KAZEROUNI LAW GROUP, APC**<br>Abbas Kazerounian, Esq. (249203)<br>ak@kazlg.com<br>Matthew M. Loker, Esq. (279939)<br>ml@kazlg.com<br>245 Fischer Avenue, Unit D1<br>Costa Mesa, CA 92626<br>Telephone: (800) 400-6808<br>Facsimile: (800) 520-5523 | **HYDE & SWIGART**<br>Joshua B. Swigart, Esq. (225557)<br>josh@westcoastlitigation.com<br>2221 Camino Del Rio South, Ste. 101<br>San Diego, CA 92108<br>Telephone: (619) 233-7770<br>Facsimile: (619) 297-1022 |
| **HAINES & KRIEGER, LLC**<br>David H. Krieger, Esq. (*pro hac*)<br>dkrieger@hainesandkrieger.com<br>8985 S. Eastern Ave. Ste. 350<br>Henderson, NV 89123<br>Telephone: (702) 880-5554<br>Facsimile: (702) 385-5518 | **KNEPPER & CLARK LLC**<br>Matthew I. Knepper, Esq. (*pro hac*)<br>matthew.knepper@knepperclark.com<br>Miles N. Clark, Esq. (*pro hac*)<br>miles.clark@knepperclark.com<br>10040 W. Cheyenne Ave.<br>Ste. 170-109<br>Las Vegas, NV 89129<br>Telephone: (702) 825-6060<br>Facsimile: (702) 447-8048 |

*Attorneys for Plaintiff,*
Sanford Buckles

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANFORD BUCKLES, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC.<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681, ET SEQ.;**<br><br>**JURY TRIAL DEMANDED** |

# INTRODUCTION

1. Plaintiff SANFORD BUCKLES ("Plaintiff") brings this Class Action Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Defendant FACEBOOK, INC. ("Defendant"), for willfully violating the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq* ("FCRA").

2. Plaintiff alleges as follows upon personal knowledge as to himself and his acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

3. Defendant is a "consumer reporting agency" under the FCRA that provides consumers with their credit reports. The FCRA governs the content of these credit reports as well as subsequent interactions between consumers and Defendant.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction because this case arises out of violations of federal law, specifically the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681(x) ("FCRA").  15. U.S.C. § 1681p; 28 U.S.C. § 1331; *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1071 (9th Cir. 2001).

5. Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Defendant does business there, and because Plaintiff consented to jurisdiction in the Northern District of California by agreeing to bring any lawsuit there as a result of Facebook's Terms and Conditions.

## PARTIES

6. Plaintiff Sanford Buckles ("Plaintiff") is a natural person residing in the County of Clark, State of Nevada.

7. Plaintiff and all putative Class members are "consumers" as that term is defined by 15 U.S.C. § 1681a(c).

8. Defendant Facebook, Inc. ("Facebook") is a corporation incorporated under the laws of Delaware Corporation with its principal place of business in California. Facebook also does business in the State of Nevada.

9. Facebook is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

10. Unless otherwise indicated, the use of Facebook's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Facebook.

11. Plaintiff, individually and on behalf of those similarly situated, brings this action to challenge the actions of Facebook in the transparency, accessibility, protection and safekeeping of the Plaintiff's and Class members' personal information.

12. Facebook failed to properly provide complete, clear, and accurate disclosures to Plaintiff and the Class, as required under 15 U.S.C. § 1681g.

FACTUAL ALLEGATIONS

Facebook is a Consumer Reporting Agency that furnishes consumer reports under 15 U.S.C. § 1681b(a)(2)

13. Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy. Consumer reporting agencies ("CRAs") have assumed a vital role in assembling and evaluating consumer credit; and the FCRA seeks to ensure that CRAs exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy. 15 U.S.C. § 1681. During an April 10, 2018 Senate hearing

which featured the testimony of Facebook's CEO, Mark Zuckerberg, both Republican and Democratic senators consistently and specifically remarked that consumers ought to have a clearer sense of what information Facebook was collecting about them and the level of "transparency" Facebook provides its users – the consumers.

14. The FCRA defines a "consumer reporting agency" to mean more than simply the "big three" national CRAs (i.e., Experian, Equifax, and Trans Union). Instead, the statutory definition encompasses "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties. . . ."[1]

15. Facebook is a CRA because it regularly assembles and transmits information regarding consumers to third party advertisers, data brokers, researchers, and other third-parties, oftentimes for a fee.[2]

---

[1] 15 U.S.C. § 1681a(f). The Federal Trade Commission routinely prosecutes actions against entities other than the "big three." *See In re ACRANET, Inc.*, File No. 092-3088, 2011 WL 479886 (FTC. Feb. 3, 2011); *In re SettlementOne Credit Corp.*, File No. 82-3208, 2011 WL 479885 (FTC Feb. 3, 2011); *In re Fajilan & Assocs., Inc.*, File No. 92-3089, 2011 WL 479887, at (FTC Feb. 3, 2011).

[2] *See* Facebook, Inc. Form 10-K filed with the United States Securities and Exchange Commission, Feb. 1, 2018, at 6, available at http://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/c826def3-c1dc-47b9-99d9-76c89d6f8e6d.pdf (last visited Apr. 10, 2018) ("Form 10-K") ("We generate substantially all of our revenue from selling advertising placements to marketers."). Facebook also previously purchased the intellectual property rights of a patent from another organization, Friendster, which would have developed a scoring model solely from information about a consumer's social network. *See* Kia Kokalitcheva, *Your Facebook friends could be the ticket to your next loan*, Fortune, Aug. 4, 2015, available at http://fortune.com/2015/08/04/facebook-loan-approval-network/ (last visited Apr. 10, 2018).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

16. Facebook's reports include, but are not limited to, transmission of "reports" to its advertising partners regarding the performance of their advertising,[3] as well as application developers, for whom Facebook does or has facilitated access to individual consumer user data.[4]

17. Facebook is compensated for its participation in the advertising process.[5]

18. Facebook regularly assembles and/or evaluates consumer information for the purpose of furnishing consumer reports to third parties, and Facebook uses interstate commerce to prepare and/or furnish the reports. Therefore, Facebook is a "consumer reporting agency" for purposes of 15 U.S.C. § 1681a(f).

19. The FCRA defines "consumer report" broadly, as "any written, oral, or other communication of any information by a CRA bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title." 15 U.S.C. § 1681a(d).

---

[3] *See* Facebook, *Measure your ads*, available at https://www.facebook.com/business/learn/facebook-ads-measuring-results (last visited Apr. 10, 2018).

[4] *See* Josh Constine, *Facebook Is Shutting Down Its API For Giving Your Friends' Data To Apps*, Techcrunch, Apr. 28, 2014, available at https://techcrunch.com/2015/04/28/facebook-api-shut-down/ (last visited Apr. 10, 2018).

[5] *See* Form 10-K, at 6.

20. Under Section 1681b(a)(2), a consumer reporting agency may furnish a consumer report "[i]n accordance with the written instructions of the consumer to whom it relates."[6]

21. Consumers who use Facebook must agree to a set of conditions that satisfy 15 U.S.C. § 1681b(a)(2). Specifically, an account-holder must agree to Facebook's "Terms of Service."[7] These terms explicitly provide that consumers who use Facebook give Facebook permission to use a consumer's "name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us."[8]

22. During April 10, 2018 testimony, Facebook's Chief Operating Officer, Mark Zuckerberg, testified to the U.S. Senate that consumers have the opportunity to review Facebook's policies and consent to them.

23. This testimony is supported by a 2011 consent decree entered into between Facebook and the Federal Trade Commission, which required Facebook to (1) refrain from making misrepresentations about the privacy or security of consumers' personal information, and (2) to obtain consumers' affirmative

---

[6] *See also* Fed. Trade Comm'n, *Big Data: A Tool for Inclusion of Exclusion?*, Jan. 7, 2016, at available at https://www.ftc.gov/system/files/documents/reports/big-data-tool-inclusion-or-exclusion-understanding-issues/160106big-data-rpt.pdf (last visited Apr. 6. 2018).

[7] Facebook Terms of Service, Jan. 30, 2015, available at http://www.facebook.com/terms.php (last visited Apr. 6, 2018) ("Terms of Service"). Facebook's terms of service form the agreement between a consumer and Facebook, Inc. *See id.*

[8] *See* Terms of Service. The Terms of Service incorporate by reference the "Facebook Principles," which include the maxim that "People should own their information," but that consumer privacy controls "are not capable of limiting how those who have received information may use it, particularly outside the Facebook Service." Facebook Principles, https://www.facebook.com/principles.php (last visited Apr. 6, 2018) ("Principles").

express consent before enacting changes that override their privacy preferences.[9]

24. Consequently, Facebook's transmissions of this consumer data qualify as a consumer report under, *inter alia*, 15 U.S.C. § 1681b(a)(2), as they are reports sent "in accordance with the written instructions of the consumer to whom it relates."

### Facebook Provides Consumer Disclosures Under 15 U.S.C. § 1681g.

25. The FCRA also entitles the consumer to take an active role in the protection of his or her sensitive personal information, by giving the consumer a right to request from consumer reporting agencies like Facebook "All information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a)(1).

26. "File," is explicitly defined in the FCRA when applied to consumers, and means, "all of the information on that consumer and retained by a consumer reporting agency regardless of how the information is stored." 15 U.S.C. § 1681a(g).

27. When a CRA discloses to a consumer that consumer's file, the disclosure must "clearly and accurately" reflect all the information in that consumer's file at the time of the disclosure. 15 U.S.C. § 1681g(a)(1).

28. Information disclosed in the consumer's "file" must include certain, specific details. For example, the information disclosed under Section 1681g of the FCRA must also include the sources of the disclosed information. 15 U.S.C. § 1681g(a)(2).

---

[9] *See In re Facebook, Inc.*, File No. 092-3184, Nov. 29, 2011; *see also* Bloomberg, *Facebook May Have Breached a 2011 Consent Agreement*, Fortune, Mar, 30, 2018, available at http://fortune.com/2018/03/29/cambridge-analytica-facebook-scandal/ (last visited Apr. 10, 2018).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

29. A consumer disclosure must also include an identification of each person (including end-users) who "procured" a consumer report for employment or another purpose. 15 U.S.C. § 1681g(a)(3). The identification of individuals must include both the name and trade name under which such person conducts business. 15 U.S.C. § 1681g(a)(3)(B)(i).

30. Disclosing sufficient information about the sources of information, as well as the identity of third parties, can assist consumers in determining whether their identity has been compromised, or whether a consumer reporting agency has made any disclosures for an impermissible purpose. *See also* 15 U.S.C. § 1681c-1(a)-(b) (permitting consumers to obtain additional copies of their consumer disclosures at no charge in the case of suspected identity theft).

31. Disclosure of this information is especially important for consumer reporting agencies, like Facebook, who provide users with some degree of control over the appropriate privacy level for their data, and whose business is premised in no small part on its ability to deliver targeted advertising content to consenting users.

32. Without full and complete disclosures of the information Facebook acquires and compiles, a consumer is unable to adequately assess whether to adjust their privacy settings to opt out of marketing campaigns, or determine whether false information is being reported about them such that they can correct the information.

33. Since at least October of 2010, Facebook has permitted consumers to download portions of their data from Facebook.[10] The information downloadable from Facebook, aside from Plaintiff's name, address, email addresses, photographs, posts, "likes," and timelines, includes (1) account status history, (2) ads clicked, (3) ad topics, (4) apps they have consented to use, (5) facial recognition data, and (6) IP Addresses.[11]

34. The information Facebook permits users to download constitutes its disclosure of information in a consumer's "file" pursuant to 15 U.S.C. § 1681g.[12]

### Facebook's Consumer Disclosures Violate 15 U.S.C. § 1681g(a)

35. In addition to the information provided to third parties as part of the advertising process, on information and belief since 2013 Facebook has also acquired a voluminous amount of data from third party sources, commonly known as "data brokers," which it integrates into its files.[13]

---

[10] Alexia Tsotsis, *Facebook Now Allows You To 'Download Your Information'*, TechCrunch, Oct. 6, 2010, available at https://techcrunch.com/2010/10/06/facebook-now-allows-you-to-download-your-information/ (last visited Apr. 10, 2018).

[11] *See* Facebook, How can I download a copy of my Facebook data?, available at https://www.facebook.com/help/302796099745838 (last visited Apr. 10, 2018) ("Download FAQ"); Facebook, Where can I find my Facebook data?, available at https://www.facebook.com/help/405183566203254?helpref=faq_content (last visited Apr. 10, 2018) ("Data FAQ"); Facebook, What categories of my Facebook data are available to me? Available at https://www.facebook.com/help/930396167085762?helpref=related (last visited Apr. 10, 2018) ("Categories FAQ").

[12] This information is coupled with information viewable from a Facebook account's "activity log," which a consumer can view when logging into their Facebook account. *See* Categories FAQ. Additional information, such as credit card numbers and linked accounts provided to Facebook, is available in the "account settings" portion of a consumer's Facebook account. *See id.*

[13] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data – But They Got Me Wildly Wrong*, Forbes, Apr. 5, 2018, available at https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

36. These data brokers, such as Experian and Acxiom, segment information on consumers based on criteria such as purchasing activity and other highly sensitive and invasive behavioral data. Indeed, one major data broker, Experian, has stated that its "industry leading database, ConsumerView, is now connected to Facebook giving you access to an unparalleled breadth and depth of data."[14]

37. A means by which Facebook collects and shares information with data brokers is its "Partner Categories" program. Through this program Facebook pairs potential advertisers with third-party data brokers to launch target Facebook marketing campaigns. The program has been described as: (1) a potential advertiser contacts a data broker requesting information related to specific consumer demographics, (2) the data broker searches its own database for contact information of consumers who meet that demographic, (3) the contact information is sent to Facebook, which places the user into a targeted "segment" and then displays the advertisement to all targeted users.[15] After the advertising campaign is completed, Facebook then sends a report back to

---

powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/#739e4b483107 (last visited Apr. 8, 2018); Josh Costine, *Facebook Lets Advertisers Tap Purchase Data Partners to Target Customers, Categories Like Car-Buyers*, TechCrunch, Feb. 27, 2013, available at https://beta.techcrunch.com/2013/02/27/facebook-ad-data-providers/?_ga=2.246742147.687259487.1523245102-1825075070.1521347830 (last visited Apr. 8, 2018).

[14] *See* Experian Product Sheet, *Experian and Facebook*, 2016, available at http://www.experian.com/assets/marketing-services/product-sheets/fb-exp-product-sheet-dec-2016.pdf (last visited Apr. 8, 2018).

[15] *See* Alex Senemar, *Facebook Partners With Shadowy 'Data Brokers' To Farm Your Information*, medium.com, Apr. 25, 2016, available at https://medium.com/sherbit-news/facebook-partners-with-shadowy-data-brokers-to-farm-your-information-1129a5878b05 (last visited Apr. 9, 2018).

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

advertisers regarding the performance of the advertisement.[16] Facebook receives some of the revenue from these marketing campaigns upon successful completion. On information and belief, the specific "Categories" which Facebook utilizes are based on information provided by a select number of Facebook marketing partners.[17]

38. The Federal Trade Commission has described such otherwise anonymous "categorical" data as information that could constitute a consumer report.[18] Specifically, the Federal Trade Commission stated:

> Suppose a company asks a consumer to provide her zip code and information about her social media and shopping behavior on a credit application, strips the consumer's identifying information, and sends the application to an analytics firm. The firm then analyzes the creditworthiness of people in the same zip code with similar social media and shopping behaviors as the consumer and provides that analysis—be it, for example, in the form of a score, a grade, or a recommendation—to the company, knowing that it is to be used for a credit decision. Because the company is using information about the consumer to generate an analysis of a group that shares some characteristics with the consumer and then is using that analysis to make a decision about the consumer, the Commission would likely regard the analysis to be a consumer report, and FCRA requirements and protections would likely apply.[19]

---

[16] *See* Senemar, *Facebook Partners With Shadowy 'Data Brokers' To Farm Your Information*.

[17] *See* Facebook, *About Partner Categories*, available at https://www.facebook.com/business/help/298717656925097 (last visited Apr. 10 2018) ("Partner Categories FAQ").

[18] *See* Fed. Trade Comm'n, *Big Data: A Tool for Inclusion or Exclusion?*, at 16-17.

[19] *Id.* at 16. In 2015, Facebook secured a patent assessing a consumer's creditworthiness based on his or her social networks, although it later altered its data access policies for third parties. *See* Kokalitcheva, *Your Facebook friends could be the ticket to your next loan*.

39. On March 28, 2018, Facebook announced that it would be "winding down" partner categories in the next six months, in order to "help improve people's privacy on Facebook."[20] However, as of the date of this Complaint, the "Partner Categories" links on Facebook are still live. According to an email sent from Facebook to its advertisers, "Partner Categories" will continue to be available in the United States until October 1, 2018.[21]

40. Another tool Facebook provides to marketers is its "Custom Audiences" program, in which Facebook permits advertisers to upload their own data for use in advertising programs. Until recently, Facebook had no controls in place to ensure that the data which advertisers uploaded to Facebook was comprised solely of first-party data, and was not instead derived from third party data brokers.[22]

41. Facebook uses a variation of its "custom audiences" program which it calls a "Lookalike Audiences" program. According to Facebook, this program is "a way to reach new people who are likely to be interested in your business because they're similar to your best existing customers."[23] Therein, a potential

---

[20] *See* Facebook, *Shutting Down Partner Categories*, Mar. 28 ,2018, available at https://newsroom.fb.com/news/h/shutting-down-partner-categories/ (last visited Apr. 8. 2018).

[21] *See* Finy Marvin, *Facebook's removing third-party targeting data: What marketers need to know*, Marketing Land, Mar. 30 2018, available at https://marketingland.com/facebooks-removal-of-third-party-targeting-data-what-we-know-237260 (last visited April 9, 2018).

[22] *See* Shareen Pathak, *How Facebook's shutdown of third-party data affects advertisers*, Digiday, Mar. 30 2018, available at https://digiday.com/marketing/facebooks-shutdown-third-party-data-affects-brands/ (last visited Apr. 10, 2018). To the degree Facebook did accept that marketing data, such data would be a "consumer report" and Facebook would be an end-user of that data.

[23] *See* Facebook, About Lookalike Audiences, available at https://www.facebook.com/business/help/164749007013531?helpref=related (last

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

advertiser chooses a "source audience" based either on collaboration with a data partner, or data which Facebook maintains in its own records; after uploading the list of records to Facebook and specifying (1) audience size, (2) target country, and (3) other criteria, Facebook (4) identifies common qualities in the "source audience," (5) identifies additional Facebook users who "look like" the advertiser's list of individuals, so that they can be used in a marketing campaign, and (6) send an advertisement to these "lookalike" individuals.[24]

42. Finally, there has been recent public outcry regarding the exposure of data "scraped" by third party actors who use targeted, consent-based interactive media to procure data from an individual Facebook user, and which consequently permits the third party to procure the information about each Facebook user or the user's "friends." The most noteworthy example of this practice was the firm of Cambridge Analytica, which purportedly used a list of approximately 300,000 Facebook users who took a "quiz" intended for research purposes to compile a list of approximately 87 million users, which it then used for targeted political campaigning.

43. Although Facebook purportedly changed its application settings in 2014 to prevent the type of clandestine "scraping" used to ultimately create the list of 87 million users in the Cambridge Analytica data breach, Facebook's public search feature – by which a user could enter an email address to find a public profile – remained in place until April 2018.

---

visited Apr. 10, 2018).
[24] *See id.*

44. Facebook CEO Mark Zuckerberg has commented that "at some point during the last several years, someone has probably accessed your public information this way."[25]

45. Facebook's disclosures contain a list of advertisers who have an individual's contact information. This list includes nothing more than the names of the advertisers in question, without specifying (1) when they received the information, or (2) whether the name disclosed is a trade name or not, and (3) the purpose for the inquiry.

46. Facebook fails to indicate the specific purpose each advertiser in question had when it procured the Plaintiff's information for the purpose.

47. Given the granulated structure of Facebook's marketing campaigns, Facebook is in a position to know precisely why any individual advertiser would have procured consumer data, but Facebook fails to describe it, or even clearly disclose whether any advertiser made an inquiry at all.

48. Finally, on information and belief, Facebook also collects the text messaging histories of users of Android phones, as well as cross-device data, including offline data.

49. As a matter of policy, Facebook fails to provide all information in the consumer's "file" pursuant to Section 1681g(a)(1). Specifically, Facebook fails to disclose to consumers the information it procures from third-party data brokers, including but not limited to the "behavioral data" which it used to develop its "partner categories" program. Facebook also failed to disclose

---

[25] Kevin Smith, *Facebook: Most users may have had public data 'scraped'*, Orange County Register, Apr. 5, 2018, available at https://www.ocregister.com/2018/04/05/facebook-most-users-may-have-had-public-data-scraped/ (last visited Apr. 8, 2018).

Case #     13 of 19     *Buckles, et al. v. Facebook, Inc.*
**CLASS ACTION COMPLAINT**

cross-device and offline data, including the text histories in its consumer disclosures.

50. Second, Facebook fails to provide the source of several material items of information in its files, in violation of Section 1681g(a)(2). Specifically, on information and belief Facebook knew or had reason to know that advertisers with a consumer's contact information procured that data from Facebook's files, or procured it from one of Facebook's data broker "partners."

51. Third, Facebook failed to provide a clear, accurate, and complete list of all individuals who made inquiries, in violation of Section 1681g(a)(3). Specifically, Facebook failed to provide a complete list of entities that it permitted access to Facebook's consumer files, including the data brokers which, like Experian, advertised that their own credit databases were "connected" to Facebook, or a list of application users who "scraped" consumer data.

52. Facebook also failed to disclose material information regarding any third-party inquiries, including the date the inquiries were made, the trade name for each inquiring third-party, or the date or purpose for which each inquiry was made.

53. Facebook's disclosures were unclear (lacking "transparency") because they referred only to a list of advertisers who had an individual's personal information, without also specifying the other types of third-parties, like Experian, who had procured the data, or the specific purposes for which an inquiry was made, including for research purposes.

### *Plaintiff's Allegations*

54. On April 5, 2018, Plaintiff downloaded a copy of his Facebook "file." His file contained each and every one of the deficiencies outlined above.

55. Thereafter, Plaintiff sent an email to Facebook, expressing concern that his consumer disclosure did not contain a list of any third-party data brokers who

had procured his information, and asking why they were not present. Plaintiff asked this question because he wanted to confirm who obtained his personal information. In this communication, Plaintiff also asked if the downloaded information was all of the information Facebook maintained on him. However, as of April 10, 2018, Facebook failed to respond to Plaintiff.

56. Facebook's failures also violated his right to privacy because Facebook deprived him of his opportunity to independently investigate the information in his file for completeness and accuracy, as well as to determine which third parties had obtained information about him. Facebook's failure to include this information caused Plaintiff to suffer a concrete informational injury because he had a right to that information under 15 U.S.C. § 1681g.

57. Facebook's disclosure failures were at least negligent, and entitle Plaintiff to an award of actual damages including, but not limited to, lost time.

58. On information and belief, Facebook's failures were willful, as Facebook had complete control over the information and as a matter of policy would not clearly, completely or accurately disclose to Plaintiff the information in his consumer file at Facebook. Thus, Plaintiff is entitled to statutory damages under 15 U.S.C. § 1681n.

## CLASS ALLEGATIONS

59. Plaintiff brings this action on behalf of a nationwide class of all similarly situated individuals ("Class"), defined as:

> All natural persons in the United States who, for the two-year period preceding the date of this Complaint and continuing until class certification, requested and obtained their Facebook consumer disclosure, wherein Facebook failed to provide:
> (a) all information it maintained in the consumer's file at the time of the request regarding the source of an advertiser's procuring of each consumer's address or other contact information;

(b) a clear, accurate, and complete list of entities which procured data from Facebook's records or obtained data therefrom; and/or

(c) a complete list of inquiries from users, which disclosed the dates and purposes of each inquiry.

60. Excluded from the Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

61. At this time the Plaintiff does not know the size of the Class because the information is exclusively in the possession of Facebook, but believes that the potential number of Class members is so numerous that joinder would be impracticable. Facebook has nearly 2 billion users worldwide, including over 200 million in the United States alone. The number of Class members can be determined through discovery, particularly investigation of Facebook's internal records of the number of downloads made of an individual's file.

62. All members of the Class have been subject to and affected by a uniform course of conduct in that the defects listed above will be present for all Class members. These are questions of law and fact common to the proposed Class that predominate over any individual questions. The questions common to all Class members include, but are not limited to:

a. Whether Defendant failed to provide consumers with clear, accurate, and complete disclosures of the information in their file when requested;

b. Whether Defendant omitted statutorily required information in those disclosures;

c. Whether Plaintiff and Class members suffered damages as a result of Defendant's failure to comply with FCRA based on the failure to disclose information;

d. Whether Plaintiff and Class members are entitled to statutory damages; and

e. Whether Plaintiff and Class members are entitled to punitive damages.

63. Plaintiff's claims are typical of the Class, as Plaintiff requested information in his Facebook file and received an incomplete consumer disclosure. All claims are based on the same legal and factual issues.

64. Plaintiff will adequately represent the interests of the Class and does not have an adverse interest to the Class. If individual Class members prosecuted separate actions it may create a risk of inconsistent or varying judgments that would establish incompatible standards of conduct. A class action is the superior method for the quick and efficient adjudication of this controversy. Plaintiff's counsel has experience litigating consumer class actions.

65. Further, under Fed. R. Civ. Pro. 23(a), Defendant acted on grounds generally applicable to the proposed Class, making appropriate final injunctive relief with respect to the proposed Class as a whole.

## COUNT ONE: VIOLATION OF 15 U.S.C. 1681 *et seq.*

66. Plaintiff restates all allegations contained above as if fully rewritten herein.

67. This Count is brought on behalf of the nationwide Class.

KAZEROUNI LAW GROUP, APC
245 FISCHER AVENUE, UNIT D1
COSTA MESA, CA 92626

68. Facebook failed to make clear, accurate, and complete disclosures, violating 15 § U.S.C. 1681g.

69. As a result of each and every willful violation of FCRA, Plaintiff and Class members are entitled to: actual damages, pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages, pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages, as this Court may allow, pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3).

70. As a result of each and every negligent non-compliance of the FCRA, Plaintiff and Class members are also entitled to actual damages, pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests the following relief against Defendant Facebook:

- For an award of actual damages against Defendant pursuant to 15 U.S.C. § 1681o;
- For an award of statutory damages pursuant to 15 U.S.C. § 1681n(a)(1);
- For an award of punitive damages against Defendant as this Court may allow pursuant to 15 U.S.C. 1681n(a)(2);
- For an award of the costs of litigation and reasonable attorneys' fees pursuant to 15 U.S.C. 1681n(a)(3) and 15 U.S.C. 1681(o)(1)(1) against Defendant for each incident of noncompliance of FCRA; and
- For all other relief this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby request a trial by jury on all issues so triable.

Dated: April 12, 2018                                    Respectfully submitted,

                                              **KAZEROUNI LAW GROUP, APC**

                                      By:    /s/ Abbas Kazerounian
                                                  ABBAS KAZEROUNIAN, ESQ.
                                                  ATTORNEY FOR PLAINTIFF